**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**ELLEN KOSTAS,**

　　　　　　　　　　Plaintiff,

　　　- against -

**PRUDENTIAL INSURANCE COMPANY OF**
**AMERICA**,

　　　　　　　　　　Defendant.

---

**Civil Action No.**

**COMPLAINT**

Plaintiff, Ellen Kostas, by her attorneys, Law Offices of Jeffrey Delott, for her

Complaint against the defendant Prudential Insurance Company of America

("Prudential")*,* alleges as follows:

**JURISDICTION & VENUE**

1.　　　Jurisdiction of the Court is based upon 29 U.S.C. §§ 1132(e)(1) and

1132(f), which give the District Courts jurisdiction to hear civil actions brought to recover

benefits due under the terms of an employee welfare benefit plan.  In addition, this

action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the

District Court jurisdiction over actions that arise under the laws of the United States.

2　　　Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2), which

allows an action under Title I of Employee Retirement Income Security Act of 1974, 29

U.S.C. §§ 1001 et seq. ("ERISA") to be brought in the district where the plan is

administered, where the breach took place, or where a defendant resides or may be

found.

## NATURE OF ACTION

3.      Plaintiff seeks to recover disability benefits pursuant to the terms and conditions of group disability contract number G-24392-NY (the "Policy) that Prudential issued to The Bank of New York Mellon Corporation (the "Policyholder").  Plaintiff, together with other employees of the Policyholder, was covered under the Policy at the time she became disabled.  Prudential not only issued the Policy, but also decides whether claimants are entitled to benefits under the Policy, which creates a conflict of interest.  The Policy sets forth the terms and conditions of the Policyholder's Long Term Disability ("LTD") Plan.  As an employee benefit welfare plan, the LTD Plan was established and maintained for the benefit of its members, and is governed by ERISA.

4.      Plaintiff's short term disability ("STD") Plan has the same definition of disability as the LTD Plan has for the first 24 months, and Prudential found Plaintiff unable to perform her sedentary occupation based solely on her having fibromyalgia.[1] Prudential's actions regarding Plaintiff's STD claim are relevant because in *Fairbaugh v. Life Ins. Co. of North America*, 737 F.Supp.2d 68, 80 (D.Conn. 2010)*,* the court ruled that, "it makes no difference that some of Plaintiff's benefits were approved as Short Term Disability ("STD") because the STD Plan and first 24 months of [the insurer's] LTD standards 'are substantively identical.'"

5.      The Social Security Administration ("SSA") definition of disability,[2] being unable to engage in any gainful occupation, is the same as the LTD definition of

---

[1]      "Fibromyalgia is a cyclic but progressive illness; symptoms are often initially interspersed with symptom-free days. Gradually, the disease becomes persistent."  UCLA Department of Medicine. http://www.med.ucla.edu/modules/wfsection/article.php?articleid=141; *see also*, *Wells v. Astrue*, 2008 WL 1832039 at *5 (E.D.Ky. Apr 23, 2008)(progressive fibromyalgia and chronic fatigue syndrome limited the claimant's ability to function in daily activities and precluded any work); *Jagielski v. Metropolitan Life Ins. Co*., 2007 WL 2458139 at *2 (W.D.Pa. Aug 24, 2007)(claimant diagnosed with "progressive CFIDS" and fatigue); *Liebenguth v. Liberty Life Assur. Co. of Boston*, 2006 WL 870618 at *7 (W.D.Tex. Mar 22, 2006)("the Court would not expect there to be any type of triggering event in this case since fibromyalgia is a progressive illness"); *Payzant v.Unum*, 402 F.Supp.2d 1053, 1058 (D.Minn. 2005)(court rejected Unum's argument that fibromyalgia is not a progressive condition); *Garmon v. Liberty Life Assur. Co. of Boston*, 385 F.Supp.2d 1184, 1187 (N.D.Ala. 2004)(claimant diagnosed with fibromyalgia that had "been very progressive over the past several months").

[2]      https://www.ssa.gov/redbook/eng/definedisability.htm#&a0=0

disability after 24 months, and the SSA continues to find Plaintiff disabled.  On July 17, 2009, the SSA approved Plaintiff's application for Social Security Disability ("SSD") benefits, which was based solely upon her having fibromyalgia. Up until the very day it terminated Plaintiff's LTD benefits, Prudential accepted the SSA's decision finding Plaintiff disabled in order to reduce the amount of LTD benefits that Prudential had to pay Plaintiff.

6.      Prudential found Plaintiff disabled for seven years, from April 18, 2008 to May 1, 2015.  Prudential terminated Plaintiff's LTD benefits without identifying a single medical finding that showed her medical impairments, including fibromyalgia, had changed, let alone improved, which is exactly what Prudential did in *Barteau v. Prudential,* 2009 WL 1505193 (C.D.Cal. 2009).  Plaintiff was diagnosed with other medical problems, including chronic fatigue syndrome ("CFS"),[3] muscular sclerosis ("MS"),[4] and cervical radiculopathy,[5] after fibromyalgia.

## STANDARD OF REVIEW

7.      A *de novo* standard of review applies to an appeal that is governed by ERISA when the entity that determined eligibility for benefits had no explicit grant of discretionary authority.  Under *de novo* review, the party with the preponderance of evidence wins.

8.      By letter dated July 22, 2015, Prudential provided "a copy of the Group Contract between Prudential and The Bank of New York Mellon Corporation."  That

---

[3]      According to the Mayo Clinic, "Chronic fatigue syndrome is a complicated disorder characterized by extreme fatigue that can't be explained by any underlying medical condition. The fatigue may worsen with physical or mental activity, but doesn't improve with rest." http://www.mayoclinic.org/diseases-conditions/chronic-fatigue-syndrome/basics/definition/con-20022009.
[4]      According to the Mayo Clinic, MS "is a potentially disabling disease of the brain and spinal cord." http://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/home/ovc-20131882.
[5]      Cervical radiculopathy is the damage from compressed nerve roots in the cervical area, which can cause pain and the loss of sensation into the arm and hand.  http://www.webmd.com/pain-management/pain-management-cervical-radiculopathy.

Policy does not contain any language that could confer discretionary authority upon Prudential.

9.     The Policy states that Prudential will give the Policyholder a certificate that "will describe the Employee's coverage under the Group Contract."  The Certificate of Coverage that Prudential gave Plaintiff does not contain any language that conferred discretionary authority upon Prudential.

10.     An "ERISA Statement" that was attached to the Certificate of Coverage has discretionary language, but its cover sheet explicitly states in its entirety:  "This ERISA Statement is not part of the Group Insurance Certificate."

11.     Under identical circumstances, this Court, in *Durham v. Prudential Ins. Co. of America,* 890 F.Supp.2d 390, 395-396 (S.D.N.Y. Aug. 28, 2012) and *Wenger v. Prudential Ins. Co. of America,* 2013 WL 5441760, at *6-7 (S.D.N.Y. Sep. 26, 2013), and in decisions from both the Eastern District in *Hamill v. Prudential*, 2013 WL 27548, at *4 (E.D.N.Y. Jan. 2, 2013), and Western District in *Bochniarz v. Prudential Ins. Co. of America,* 2015 WL 8516432, at *2-3 (W.D.N.Y. Dec. 12, 2015), all held that the ERISA Statement failed to confer discretionary authority on Prudential.

12.     Even if the ERISA Statement stated that it was part of the Certificate of Coverage, and even if the Certificate of Coverage were part of the Policy, Prudential would still lack discretionary authority.  The Certificate states that Prudential may stop paying benefits when a claimant fails "to submit proof of continuing disability satisfactory to Prudential," and when construing that verbatim language in *Durham,* 890 F.Supp.2d at 395, this Court ruled that such language "does not confer discretion on Prudential," thereby rendering the issue *res judicata*.

13.     A *de novo* standard of review applies to Prudential's decision to terminate Plaintiff's disability benefits.

## THE PARTIES

14.     Plaintiff, Ellen Kostas, is a resident of New York, New York, and at all relevant times was a participant who was eligible to receive benefits under the LTD Plan that are provided by the Policy.

15.      According to the New York State Department of Financial Services, Defendant, Prudential, is licensed to conduct the business of insurance in the State of New York.

16.     Prudential, which issued the Policy, acted as claims fiduciary for the LTD Plan, as it exercised authority and control over the payment of benefits.  Prudential is the "appropriate named fiduciary" of the Plan as described in 29 C.F.R. § 2560.503-1(h)(1).


THE LTD PLAN

17.     After receiving 24 months of LTD benefits, a claimant is disabled when unable to perform the duties of "any gainful occupation."

18.     Plaintiff's 24 months of LTD benefits ended on October 14, 2010, and then Prudential found Plaintiff disabled from any gainful occupation for an additional 5 years through May 1, 2015.

19.     Because Plaintiff became disabled before she turned 61 years of age, the maximum duration of her LTD benefits is her normal Social Security retirement age, which is 67.

20.     After initially establishing entitlement to a monthly benefit equal to 60% of salary, which for Plaintiff amounted to $6,250 a month, a claimant can be required to submit "proof of continuing disability, satisfactory to Prudential, indicating that you are under the regular care of a doctor," and Prudential can "stop sending you payments if the appropriate information is not submitted."

21.     Claimants are required to apply for SSD benefits, which reduce LTD benefits by an equal amount.  Prudential offset Plaintiff's LTD benefits in an amount equal to her SSD benefits.

22.     Prudential did not include fibromyalgia or CFS as medical conditions that are not covered under the LTD Plan.

## STATEMENT OF FACTS

### The Vocational Facts

23.     Plaintiff was born November 16, 1971.

24.     Plaintiff worked for the Policyholder as a private banker from November 1993 until April 16, 2008, at which time her salary was $125,000.08.  Filing for disability meant that Plaintiff had to give up 40% of her income; *i.e.,* $41,666.69 a year.

25.     According to Bel Dama, Prudential's "Vocational Rehabilitation Specialist," Plaintiff's job as a private banker was sedentary work.   According to the *Dictionary of Occupational Titles* ("DOT"), published by the U.S. Department of Labor, sedentary work is the least demanding physical class of work.  *Marantz v. Permanente Medical Group LTD Plan,* 2009 WL 5174695 (N.D.Ill. Dec. 21, 2009).

26.     According to the DOT*,* which Prudential claimed it used, "sedentary work involves up to two hours of standing and walking and at least six hours of sitting in an eight-hour work day," and lifting up to 10 pounds for up to a third of the day.  *Alfano v. CIGNA,* 2009 WL 222351, at *14 (S.D.N.Y. Jan. 30, 2009).  "Sedentary work is work that 'involves up to *two hours of standing or walking* and *six hours of sitting* in an eight-hour work day."  *Wykstra v. Life Ins. Co. of N. Amer*., 849  F.Supp.2d 285 (W.D.N.Y. 2012); *Connors v. CIGNA*, 272 F.3d 127 (2d Cir. 2001).

27.     A light occupation requires lifting 20 pounds for up to a third of the day, 10 pounds for up to two thirds of the day, and standing and walking for 6 hours during an 8 hour day.  *Sewell v. Lincoln Life,* 2013 WL 1187431, at *5 (S.D.N.Y. Mar. 22, 2013).

**Significant Pre-Disability Medical Facts**

28.     On September 28, 2004, Dr. Richard Collins, Plaintiff's internist, referred her to Dr. James Faller after Plaintiff tested positive for Epstein Barr Virus.  Prudential noted that Dr. Faller is "a renowned rheumatologist."  Dr. Faller has been selected multiple times by New York Magazine as one of New York's best Rheumatologists, and fibromyalgia is one of the areas of his specialization.  Dr. Faller graduated *Magna Cum Laude* with an Honors Major in Biochemistry from The University of Pennsylvania in 1973, and graduated from the medical school at The University of Pennsylvania in 1977.  His residency in Internal Medicine was completed at Rush Presbyterian St. Lukes Medical Center in Chicago from 1977 to 1980; whereafter, from 1980 to 1982, the Arthritis Foundation awarded him a research grant in Rheumatology at the University of Michigan, which is also where he completed his fellowship.  Dr. Faller was board certified in Internal Medicine in 1980 and in Rheumatology in 1982.  He is a fellow of the American College of Physicians and a Founding Fellow of the American College of Rheumatology, which established the medical standard for diagnosing fibromyalgia. Since 1992, Dr. Faller has been in private practice in Manhattan, where he holds an appointment on the teaching faculty at Columbia University, and is also the Chief of the Arthritis Clinic at Roosevelt Hospital where he holds an appointment as a Senior Attending.

29.     "Fibromyalgia 'is a rheumatic disease and the relevant specialist is a rheumatologist.'"  *Garlington v. MetLife Inc. Co.,* 2012 WL 7589403, at *10, n. 5 (N.D.Ga. Dec. 31, 2012) citing *Pinto v. Aetna Life Ins. Co.,* 2011 WL 536443, at *3 n. 7 (M.D.Fla. Feb. 15, 2011), quoting *Sarchet v. Charter,* 78 F.3d 305, 307 (7th Cir.1996).

30.     Dr. Faller's treatment notes from September 28, 2004 noted that Plaintiff had been sick for over a year with myalgias, severe fatigue, hand stiffness, neck and back trigger points, which he described as a CFS/Fibromyalgia like syndrome.

31.     Based on Plaintiff's fibromyalgia and chronic fatigue, Dr. Faller only released Plaintiff to working half days for four days a week after examining her on October 12, November 9, and December 21, 2004.

32.     On February 15, 2005, Dr. Faller diagnosed Plaintiff with fibromyalgia with morning pain, noted she was not sleeping well, was taking Neurontin, and required work modification.

33.     On April 5, 2005, Dr. Faller reported that Plaintiff had fibromyalgia symptoms, including trigger points.

34.     On June 7, 2005, Dr. Faller noted that Plaintiff was fatigued and was sleeping poorly, but was back at work with difficulty.

35.     On July 26, August 30, September 27, and October 27, 2005, Dr. Faller diagnosed Plaintiff with fibromyalgia, said she was fatigued, was sleeping poorly, and had trigger points.

36.      An October 30, 2005 sleep study was abnormal, and objectively confirmed that Plaintiff had insomnia.

37.     On January 12, 2006, Dr. Faller diagnosed Plaintiff with fibromyalgia and sleep disorder, and commented that she had severe daytime fatigue.  He prescribed Cymbalta, one of three drugs FDA approved for fibromyalgia, Neurontin, and Xanax.

38.     On January 16, February 16, April 19, May 25, June 26, July 25, and August 23, 2006, Dr. Faller diagnosed Plaintiff with fibromyalgia and CFS, noted trigger points and sleep disturbance, and after having prescribed Cymbalta, found that it had been ineffective.

39.     On September 25 and October 20, 2006, Dr. Faller diagnosed Plaintiff with fibromyalgia and said her sleep disturbance was severe, but she could not tolerate Lunestra.[6]

---

[6]  Lunestra treats insomnia.  http://www.lunesta.com/

40.     On November 28, 2006, January 3, February 18, May 7, June 12, July 25, and August 24, 2007, Dr. Faller continued to diagnose Plaintiff with fibromyalgia, sleep disorder.

**Plaintiff's STD Claim**

41.     On April 4, 2008, Dr. Faller diagnosed Plaintiff with fibromyalgia, noted the trigger points, and said that Plaintiff was unable to arrive at work before 10 am because of her symptoms.

42.     A few days later, Prudential received Plaintiff's STD application.  Plaintiff told Prudential's Cecilia Guzman that Plaintiff was unable to arrive at work on time because her fibromyalgia pain had become increasingly worse, and that she had exhausted her vacation time when her pain had flared up.

43.     On April 17, 2008, Dr. Faller reported that Plaintiff had severe fibromyalgia muscle pain and marked fatigue, as well as insomnia, but he hoped that three months' rest would enable Plaintiff to resume working.  That same date, Guzman noted that the Policyholder advised disability for Plaintiff.

44.     On April 18, 2008, Guzman approved Plaintiff's STD benefits from April 16, 2008 through May 18, 2008, and New York State statutory disability benefits from April 23, 2008 through May 18, 2008, based solely upon Plaintiff's fibromyalgia.[7]

45.     On May 13, 2008, Dr. Faller reported that Plaintiff had severe fibromyalgia, and increased her Lyrica.[8]

46.     On May 21, 2008, Plaintiff told Prudential's Pauline Robinson that her Lyrica, her fibromyalgia medication, made her dizzy and lightheaded.  Prudential remarked that disability had been approved based on fibromyalgia.

---

[7]  Prudential produced an April 18, 2008 fax from Guzman about an article that concerned fibromyalgia, but despite Plaintiff's request, Prudential refused to provide a copy of the article.
[8]  Lyrica is used to treat fibromyalgia pain.  http://www.lyrica.com.

47.     The following day, Dr. Faller stated Lyrica made Plaintiff very sleepy, and he noted she had 14 trigger points and serologic evidence of Epstein Barr.  Dr. Faller stated Plaintiff remained disabled due to severe fibromyalgia.

48.     On May 22, 2008, Dr. Faller stated that Plaintiff should remain on disability because of her severe fibromyalgia.  Dr. Faller identified 14 specific trigger points, noted severe fatigue and inflammation, and said Plaintiff had serologic evidence of the Epstein Barr Virus.

49.     On May 23, 2008, Prudential's nurse, Kelly Okray, concluded Plaintiff's functionality was "less than part time sedentary."

50.     On May 28, 2008, Robinson approved both Plaintiff's STD benefits and New York State statutory disability benefits through June 18, 2008, based solely upon Plaintiff's fibromyalgia.

51.     On June 16, 2008, Dr. Faller said there had been no significant improvement in Plaintiff's ongoing severe fibromyalgia symptoms, which prevented her from resuming work for at least another two months.  Plaintiff had clear cut trigger points in her neck, shoulders, elbows, knees, ankles and lower back.

52.     On June 26, 2008, Robinson approved both Plaintiff's STD benefits and New York State statutory disability benefits through July 18, 2008, based only on Plaintiff's fibromyalgia, as there had been no significant improvement that would allow Plaintiff to resume working.

53.     On or about July 18, 2008, Dr. Faller completed Prudential's Capacity Questionnaire ("CQ").  In the CQ, Dr. Faller stated Plaintiff could not work full time, and limited her to sitting for 3 hours a day, and standing and walking for 2 hours, because of her severe fibromyalgia pain and high levels of inflammation.  Dr. Faller said it was undetermined when Plaintiff could return to work, even from home, because she was severely limited by severe fibromyalgia pain and high levels of inflammation.

54.     On July 20, 2008, Dr. Faller wrote Dr. Collins that Plaintiff cannot work on a full time basis and had positive C-reactive protein.

55.     On August 25, 2008, Dr. Faller confirmed that Plaintiff had started physical therapy, and stated that she remained clearly disabled and unable to resume work even in a limited capacity of half days, for four days a week.  He said Plaintiff was severely encumbered by her fibromyalgia symptoms, including typical severe trigger points in the neck, trapezius, shoulders, elbows, and back.

56.     On August 28, 2008, Prudential's Joseph Walles stated that Plaintiff was not disabled because she had worked previously with fibromyalgia, and wanted her to go to an insurance medical examination ("IME"), even though Dr. Faller's findings and conclusions continued to confirm hat Plaintiff lacked a sedentary work capacity.

57.     On September 1, 2008, Dr. Faller provided a detailed narrative report that explained why Plaintiff's objective medical evidence supported her inability to resume working.  None of the medications prescribed for Plaintiff had improved her sleep or fatigue to enable her to work.  Plaintiff's abnormally high level of C-reactive protein, platelet count and sedimentation rate inflammatory blood markers, and abnormal sleep study helped explain her joint and muscle pain and non-restorative sleep.  Although those positive tests are not the basis for a fibromyalgia diagnosis they showed that there was something wrong because those objective medical findings are not found in healthy individuals.  Consequently, Dr. Faller said Plaintiff was "severely encumbered," "should be placed on long term disability," and "continues to be significantly disabled."

58.     The maximum possible duration for Plaintiff's STD benefits was through October 14, 2008, and the start date for LTD benefits was the following day.

59.     On October 23, 2008, Dama discussed Plaintiff's case with Prudential's legal department, but Prudential deleted those communications from the file.

60.     On October 24, 2008, Dr. Faller reported that Plaintiff's condition had not changed, including severe neck and shoulder pain, and stiff hands and wrists.  Dr.

Faller specified that Plaintiff had "no clearcut improvement in function," and concluded that she remained "unable to work."

61.    On November 11, 2008, Walles asked for surveillance for Plaintiff.

62.    On December 12, 2008, Walles told Plaintiff that he could not find a rheumatologist in Manhattan for the IME, and that she had to travel 55 miles to Tinton, NJ, to be examined by Kenneth Wasser.

63.    Plaintiff attended the Wasser IME on December 29, 2008.  Wasser concluded that "This claimant fulfills the criteria for fibromyalgia."  When asked to "provide a detailed explanation supporting your opinion" that Plaintiff had no functional loss, Wasser was unable to do so.  Instead, Wasser stated that "The claimant does have fibromyalgia," which "is difficult to substantiate by objective testing," and therefore was not functionally disabled.  However, Prudential knows that requiring objective testing sets an "artificially high threshold that conflicts with numerous decisions that courts have found, on similar facts, that disability claims based on fibromyalgia and chronic fatigue syndrome may be premised on subjective evidence and the reports of treating physicians" because that "threshold that can never be met by claimants who suffer from fibromyalgia or similar syndromes, no matter how disabling the pain."  *Eisner v. Prudential Ins. Co. of Amer.*, 10 F.Supp.3d 1101, 1117 (N.D.Calif. 2014).

64.    On January 12, 2009, Walles remarked that because Wasser had said that Plaintiff did not use a cane and lived alone, she had no functional loss, and her fibromyalgia pain was not substantiated by EMG or MRI testing.  Therefore, Walles terminated Plaintiff's STD benefits, and denied LTD benefits, even though: "[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.... Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia."  *Eisner*, 10 F.Supp.3d at 1114.

65.     On February 9, 2009, Dr. Faller stated that Plaintiff's condition had evolved, and that she was forced to stop working by her employer who would not permit her to continue working on a modified schedule to accommodate her condition.

66.     Plaintiff applied for SSD benefits on April 4, 2009, based solely on her having fibromyalgia.

67.     On April 11, 2009, Plaintiff went to Dr. Bruce Stein, who specializes in arthritis and rheumatology, for a second opinion, and to schedule EMG testing.

68.     Dr. Stein completed EMG/NCV testing on April 20, 2009.  The testing revealed that Plaintiff had cervical radiculopathy at the C5-6 and C6-7 levels.  Radicular symptoms at those cervical levels include: pain and weakness in the neck, shoulders, arms, wrists, hands, and fingers.[9]

69.     Dr. Stein completed a Medical Source Statement ("MSS") on May 19, 2009 that diagnosed Plaintiff with fibromyalgia.  He identified positive trigger points as the objective clinical examination findings. Among other things, Dr. Stein rated Plaintiff's pain and fatigue as severe, which he said would be even worse if she resumed working, and which constantly interfered with her attention and concentration.  During an 8 hour work day, Dr. Stein limited Plaintiff to standing/walking 1 hour, sitting 1 hour, and lifting/carrying between 0 and 5 pounds for up to a third of the day.  He also said that Plaintiff would need a 30 minute break every 30 minutes.

70.     On May 22, 2009, Plaintiff was examined by a leading CFS expert, Dr. Susan Levine, who is triple board certified in Infectious Disease, Allergy & Immunology, and Internal Medicine.  In *Sansevera v. E.I. DuPont de Nemours & Co., Inc.*, 859 F.Supp. 106 (S.D.N.Y. 1994)(awarding LTD benefits and attorney fees to plaintiff), the court held that Dr. Levine, " had extensive experience with CFS patients and, in 1990, was one of thirteen physicians appointed to serve on a committee organized by the Center for Disease Control to study CFS."  In *Locher v. UNUM Life Ins. Co. of America*,

---

[9]     http://www.spine-health.com/conditions/neck-pain/what-cervical-radiculopathy.

2002 WL 362769 (S.D.N.Y. Mar. 7, 2002), *affirmed,* 389 F.3d 288 (2d Cir. 2004)(finding LTD claimant disabled), the court provided: "Dr. Levine is a recognized expert and continues to participate in CFS-related professional activities."  The SSA has also recognized Dr. Levine as a CFS specialist.  *Solomon v. Barnhart*, 2006 WL 3794292 (S.D.N.Y. Dec. 28, 2006).  Dr. Levine's extensive *curriculum vitae* detailing her expert qualifications in CFS was provided to Prudential.

71.     Dr. Levine explained that while there is no diagnostic test for CFS or fibromyalgia, laboratory results indicated Plaintiff tested positively for Epstein Barr Virus, Human Herpes Virus 6, and had low levels of IGF-1 and pneumococcal antigens, which are associated with CFS and fibromyalgia patients.  Dr. Levine diagnosed Plaintiff with fibromyalgia and CFS, which she noted overlap about 70% of the time.

72.     Dr. Levine stated that it is impossible for a doctor to conclude that a person is not functionally disabled by CFS or fibromyalgia based upon a one time exam. Dr. Levine discussed numerous errors in the Wasser IME.

a.     First, Dr. Levine explained that Wasser did not understand fibromyalgia or CFS because you would expect normal findings except for trigger points for fibromyalgia.  Perhaps more importantly, Dr. Levine explained that fibromyalgia and CFS involve "'post exertional' fatigue that may not manifest for up to 24 hours," which rendered Wasser's report "misleading and inaccurate."

b.     Second, Dr. Levine explained that Wasser erred by finding it significant that Plaintiff did not exhibit decreased range of motion or neurological abnormalities because those findings should be normal for a person with fibromyalgia or CFS.

c.     Third, Wasser said that because Plaintiff did not use a cane or assistive device, can perform personal hygiene, prepare simple meals, and occasionally go shopping, it showed she was not functionally disabled.  However,

Dr. Levine explained that Wasser did "not fairly" assess Plaintiff's functionality because there is no evidence that she can do any of those things predictably or continuously.

       d.      Fourth, Dr. Levine pointed out that Wasser failed to probe into the effect that Plaintiff's medications have on her ability to function.  Dr. Levine noted that Plaintiff experienced sedation and weight gain from Lyrica, which posed a Catch-22.  If Plaintiff takes the Lyrica, its sedative effects reduce her cognitive abilities even further, and if she does not take the Lyrica, then her pain prevented her from performing sustained activities.

       e.      Fifth, consistent with Plaintiff's prolonged work history at a high paying job, Dr. Levine found that Plaintiff was not magnifying her symptoms, nor malingering.  To the contrary, Dr. Levine concluded that Plaintiff "is certainly motivated to return to her stimulating job."

       f.      Most importantly, Dr. Levine stated that because of the nature and severity of Plaintiff's condition and lack of cure, no sustained improvement was likely.

       73.      Dr. Levine completed a MSS on May 22, 2009, which identified Plaintiff's diagnoses, supporting clinical findings, and symptoms.  Dr. Levine said that Plaintiff's pain and fatigue were severe, constantly interfered with attention and concentration, and would be even worse if she resumed working.  She concluded that during an 8 hour day, Plaintiff was limited to sitting for less than 1 hour, and standing/walking less than half an hour.  Other restrictions included balancing, stooping, crawling, crouching, bending/twisting, heights, fingering/fine manipulation,

humidity/wetness, fumes/gases, noise, and rarely climbing, kneeling, reaching, use of hands, and driving.

74.     On June 11, 2009, Dr. Faller reported that Plaintiff had a great deal of musculoskeletal pain and fatigue, and that while he initially hoped Plaintiff could recover from a fibromyalgia flare up, her pain and fatigue "rendered her permanently disabled."  Dr. Faller said Wasser's opinion, that Plaintiff's fibromyalgia caused no limitations, was baffling because Plaintiff had a classic and severe case of fibromyalgia pain and fatigue.  Dr. Faller explained that the absence of neurologic abnormalities, which Wasser highlighted, are irrelevant to fibromyalgia, and that Plaintiff' "clearly has adequate physical findings today given her number of trigger points to firmly diagnose fibromyalgia and her level of symptomology is sufficient to warrant a complete disability from work."  Dr. Faller added that C-reactive protein is a constant marker of her inflammation, which contributes to her disease.

75.     On June 12, 2009, Dr. Stein prepared a narrative report, in which he diagnosed Plaintiff with fibromyalgia and cervical radiculopathy.  Besides the tender points, Dr. Stein stated Plaintiff had poor sleep at night and daytime fatigue, with worsening joint pain.  Based on his exams and testing, Dr. Stein concluded that Plaintiff "remains unable to work" because of the pain, fatigue, and poor restorative sleep causing poor concentration from her fibromyalgia and cervical radiculopathy.

76.     On June 25, 2009, Dr. Faller completed a MSS that, among other things, diagnosed Plaintiff with fibromyalgia, fatigue, and insomnia, rated her pain and fatigue as severe, which he said would be even worse if she resumed working, and which constantly interfere with her attention and concentration.  During an 8 hour work day, Dr. Faller limited Plaintiff to standing/walking 2 hours or sitting 2

hours, and lifting/carrying less than 10 pounds.  He also said that Plaintiff would need a 5-10 minute break every 15-20 minutes.  Supporting examination findings were severe musculoskeletal pain with trigger points, fatigue, depression, sleep disturbance, morning stiffness, cognitive dysfunction, inability to concentrate/pay attention/focus, fevers, and sore throat.  C reactive protein levels, elevated EBV and herpes virus 6 titers were cited as supporting laboratory tests.

77.     On June 29, 2009, Amy Peiser Leopold, a vocational expert, completed a Vocational Assessment ("VA") for Plaintiff.  Among other things, Ms. Leopold worked as a vocational consultant for Unum for over a decade on its LTD claims.  The VA concluded that Plaintiff lacked the functional capacity to perform the physical demands of her own or any other occupation, which included all sedentary work, due to the pain and fatigue caused by her severe medical conditions.

78.     The VA related that because Plaintiff was very good at her job, the Policyholder was extremely accommodating about its physical requirements.  Even though Plaintiff was out on disability for three months in 2003, she pushed herself to return to work, but missed at least one day of work per week as a result of her condition.  On other days, Plaintiff was only able to work from 1pm on.  The Policyholder allowed Plaintiff to work at her own pace for five years, but then told her to apply for STD in April 2008, as her condition had worsened.

79.     Ms. Leopold concluded:

Due to the ongoing and severe pain caused by Ms. Kostas's medical conditions, it is this Consultant's opinion that she would not be able to perform the duties of her own occupation as an Assistant Vice President in Private Banking/Private Client Services.  Furthermore, it is this Consultant's opinion that Ms. Kostas's condition renders her unable to perform in any occupation based on the medical evidence provided and her continued inability to perform at the sedentary level.

80.     Plaintiff appealed the termination of her STD benefits and denial of LTD benefits on July 6, 2009.

81     On July 17, 2009, the SSA found Plaintiff disabled from any gainful occupation.

82.     Because the treating physicians continued to support Plaintiff's disability, Walles asked MES Solutions to have some other doctor review Plaintiff's "symptoms of fatigue and pain attributed to fibromyalgia and chronic fatigue syndrome."

83.     On September 16, 2009, MES Solutions faxed a peer review report from Dr. John L. Brusch to Prudential.  Dr. Brusch stated that he spoke with another MES reviewer "who believes that the claimant does have fibromyalgia."

84.     Dr. Brusch agreed that Plaintiff was functionally impaired:

Ms. Kostas is significantly impaired because of cognitive difficulties.  She is unable to pay attention and concentrate and has significant difficulty in word finding.  Her movement is impaired because of significant pain 8-10/10 scale and her fatigue is also 8-10/10.  These symptoms have been diagnosed by rheumatology and infection (Dr. Faller) and Infectious Disease (Dr. Levine) as being due to the overlap in symptoms of fibromyalgia and chronic fatigue syndrome.

85.     Dr. Brusch detailed Plaintiff's functional limitations:

The claimant's impairments result in severe limitations. She can only sit, stand, and walk for up to 2 per 8 hour day. She can occasionally lift and carry up to 9 pounds.  She cannot balance, stoop, crawl, crouch, bend or twist.  She can rarely climb or kneel and can only push/pull up to l0pounds. She limited in driving (no more than 2 hours per 8 hour day). She can only occasionally handle and reach and cannot use her feet to do repetitive motions (i.e. foot control). Her fine manipulation skills are poor. Due to the unpredictability of the claimant's fatigue, she most likely would need to take unscheduled breaks on an hourly basis; the length of which will depend on the claimant's fatigue.

86.     Dr. Brusch made clear that Plaintiff has CFS:

The claimant does have chronic fatigue syndrome.  She meets the CDC criteria for diagnosis. She also meets the Multidimensional Fatigue Inventory and Symptoms Inventory Case Definition Subscale scoring that would validate that she has had substantial accompanying symptoms. She has no underlying disease that would mimic chronic fatigue syndrome.  These are validated scoring systems.  They should be thought of as the functional assessment for chronic fatigue syndrome.  The outlook for

her is very poor. Because she has had the disease so long, the chance for a really meaningful recovery is at best five percent.

87.    Dr. Brusch concluded that Plaintiff's symptoms were well supported:

The medical record does support Ms. Kostas' severe pain and loss of function. The claimant has been followed by rheumatology and infectious disease specialists, respectively Dr. Faller and Dr. Levine. They have diagnosed fibromyalgia and chronic fatigue syndrome in this claimant as the causes of her symptoms. She meets the diagnostic criteria for these diseases as documented in their notes. Specifically I refer to Dr. Faller's letter to Attorney Green in rebuttal to the IME performed try Dr. Wasser.  Dr. Wasser does state that she suffers from fibromyalgia but denies that this disease is causing her significant symptoms. He bases this on her lack of physical findings except for trigger points of fibromyalgia.

**Fibromyalgia does not have any distinctive physical findings except the trigger point areas.  It is a real disease entity and can cause all her symptoms.  It is known to be a fluctuating disease.** The important consideration in making this diagnosis is that there are no other alternative diagnoses to explain her symptoms. She does have depression but this is really secondary to the catastrophe of her problem. The key points in the history of an affective disorder are that it strikes someone, who has been quite healthy, suddenly. This is certainly the claimant's history. (emphasis added).

Dr. Levine's letter of 5/22/09 confirmed the diagnosis of fibromyalgia with an overlapping diagnosis of chronic fatigue syndrome. She made the diagnosis of chronic fatigue syndrome on the combination of a red throat, and large cervical lymph nodes and her history. These diseases are unique in that they produce a marked change in affect/symptomatology without a great deal of clinical evidence in support of them.  **A major clinical finding here besides the physical findings of Dr. Levine is a sleep study of 10/30/05 that shows markedly impaired sleep on the basis of psychophysiological insomnia. (emphasis added)**

88.    Most importantly, Prudential asked Dr. Brusch "is improvement likely" for

Plaintiff, to which he answered no:

The claimant has been receiving maximum treatment of Lyrica, and physical therapy, antidepressants. She has failed to respond to any of these and makes improvement very unlikely although possible. Therefore, improvement is not likely.

I base this opinion on the natural history of fibromyalgia and chronic fatigue syndrome.

89.    On September 17, 2009, Walles stated that Dr. Brusch's opinion that

Plaintiff has a "less than sedentary work capacity" "is consistent with the opinions

expressed by [Plaintiff's] own doctors, and also with the findings of the Social Security Administration."  Therefore, Walles approved Plaintiff's STD benefits through the maximum duration October 14, 2008; approved Plaintiff's New York State statutory disability benefits through the maximum October 21, 2008 duration; and approved Plaintiff's LTD benefits starting October 15, 2008.

90.     **Subsequent to September 17, 2009, Prudential never identified a single medical record that showed any improvement in either Plaintiff's fibromyalgia or CFS.**

**Plaintiff's LTD Claim**

91.     On October 19, 2009, after finding that Plaintiff was disabled from her regular sedentary occupation, Prudential's Gina Hendricks also approved Plaintiff's LTD benefits.   Hendricks said that after Plaintiff received 24 months of LTD benefits, which would be on October 14, 2010, "in order to continue to be eligible for benefits beyond this date, you must be unable to perform the duties of any gainful occupations."

92.     Prudential found Plaintiff unable to perform the duties of any gainful occupation for 5 five years, and continued to pay her LTD benefits, until May 1, 2015.

**Medical Records and Prudential's Review Before Benefit Termination**

93.     On October 12, 2011, Prudential had Dr. Faller complete an attending physician statement ("APS"), which diagnosed Plaintiff with fibromyalgia, chronic fatigue, and back pain.  Dr. Faller concluded that pain, fatigue, and medication affected Plaintiff's focus, precluding repetitive activities, lifting, bending, carrying,

standing, or prolonged sitting.  Significantly, Dr. Faller averred that Plaintiff's

condition was permanent, and that she could not return to work.

94.     On November 30, 2011, more than a year into the LTD Plan's "any

gainful occupation" definition of disability, Prudential's John Leclercq performed a

medical review.  He noted that Plaintiff was impaired by fibromyalgia, chronic

fatigue, and back pain, was able to do her activities of daily living, and had medical

flare ups.

95.     On December 1, 2011, Leclercq determined that Plaintiff "has less

than part-time sedentary capacity, no expectation of improvement."  Therefore,

**Leclercq concluded that Prudential should "pay through the maximum**

**duration date of 11/15/2038."**  Leclercq determined that because Plaintiff's

medical condition would not improve, which is what both Dr. Brusch and Dr. Faller

had concluded, that Prudential should pay Plaintiff until she exhausted LTD benefits

under the LTD Plan.

96.     **Consistent with Leclercq's conclusion, Prudential has never**

**identified a single medical record that shows any improvement in Plaintiff's**

**fibromyalgia or CFS after December 1, 2011.**

97.     Plaintiff's January 17, 2013 brain MRI revealed optic nerve

enhancement consistent with optic neuritis,[10] which is often the first sign of MS,"[11]

abnormal hyperintensities in the white matter[12] consistent with demyelinating

---

[10]     Optic neuritis is inflammation of the optic nerve that causes pain and temporary vision loss, and is highly associated with vision loss according to the Mayo Clinic.  http://www.mayoclinic.org/diseases-conditions/optic-neuritis/basics/definition/con-20029723.
[11]     "Optic Neuritis and MS," Dr. Edward J. Atkins, Multiple Sclerosis Foundation. http://www.msfocus.org/article-details.aspx?articleID=380.
[12]     "White matter hyperintensities predict an increased risk of stroke, dementia, and death." http://www.medscape.com/viewarticle/726378.

disease,[13] which is any disease of the nervous system in which the myelin sheath of neurons is damaged,"[14] and cerebral lesions.

98.     Plaintiff's January 17, 2013 cervical MRI revealed multiple abnormal hyperintensities in the spine "consistent with advanced demyelinating disease," reversal of lordosis indicative of muscular spasm, and spondylosis at the C5-6 and C6-7 levels causing the discs to abut the spinal cord.

99.     On July 12, 2013, because her MS had begun to show new symptoms, Plaintiff was sent by Dr. Armistead Williams III for a brain and cervical spine MRI.  Dr. Williams is one of the World's leading MS experts.  He works at the International Multiple Sclerosis Management Practice, which is where he also did his Fellowship, and was selected to the New York Super Doctors List by Time Magazine.  A board certified neurologist and member of the American Academy of Neurology, Dr. Williams received his B.A. from the University of Virginia, MD and internship from its Medical Center, and trained at the Neurological Institute of Columbia University Medical Center, the Nation's foremost neurological center, where he won the award for outstanding patient care as a resident.  Dr. Williams specializes in comprehensive MS patient care.

100.    The new MRI confirmed that Plaintiff's MS had gotten worse.  There were white matter abnormalities, new areas of demyelination, and lesions at the C3-4, C4-5, C5-6, and C7-T1 levels.  Moreover, the MRI revealed degenerative disc disease at the C5-7 levels as well as protruding discs flattening the spinal cord at the C5-6 level and abutting the spinal cord at the C6-7 level.  Symptoms from the

---

[13]     Multiple sclerosis is the most common demyelinating disease according to the Mayo Clinic. http://www.mayoclinic.org/demyelinating-disease/expert-answers/faq-20058521/.
[14]     http://en.wikipedia.org/wiki/Demyelinating_disease.

spinal cord being impinged or abutted at these two levels include:  progressive

spasticity in the legs, hand weakness, atrophy and sensory loss, arm and neck

pain.[15]

101.    Dr. Williams sent Plaintiff for a lumbar spine MRI on August 1, 2013,

because of her continued back pain and sciatica.[16]  The MRI revealed multilevel

degenerative disc disease, a disc protrusion at the T12-L1 level, foraminal

stenosis,[17] facet arthropathy from the L4-S1 levels, and a protruding disc at the L5-

S1 level that abutted the S1 nerve root.  Facet arthropathy is arthritis of the facet

joints in the spine,[18] is a common cause of low back and neck problems that render

patients disabled.[19]

102.    On November 5, 2013, Plaintiff began treating with Dr. Tamer Elbaz

for lower back pain that had persisted for a year despite Percocet,[20] Baclofen,[21] and

physical therapy.

103.    Dr. Elbaz is board certified in both Anesthesiology and Pain Medicine,

for pain management.  Dr. Elbaz completed his anesthesiology residency at

Downstate Medical Center and Pain Medicine training and fellowship at St. Luke's –

Roosevelt Hospital, and became its Program Director.  Dr. Elbaz teaches Pain

Medicine and Anesthesiology at Columbia University College of Physicians and

---

[15]     Essentials of Clinical Neurology: Lesion's of the Spine and Spinal Cord, L.A Weisberg, C. Garcia, R. Strub. http://tulane.edu/som/departments/neurology/programs/clerkship/upload/wch19.pdf.
[16]     According to the Mayo Clinic, "Sciatica refers to pain that radiates along the path of the sciatic nerve, which branches from your lower back through your hips and buttocks and down each leg." http://www.mayoclinic.org/diseases-conditions/sciatica/basics/definition/con-20026478.
[17]     "Lumbar spinal stenosis is a medical condition in which the spinal canal narrows and compresses the spinal cord and nerves. http://en.wikipedia.org/wiki/Lumbar_spinal_stenosis.
[18]     http://arthritis.about.com/od/spine/p/facet_joints.htm.
[19]     http://www.spine-health.com/conditions/arthritis/symptoms-and-diagnosis-facet-joint-problems.
[20]     Percocet is a combination of the narcotic Oxycodone and acetaminophen. http://www.webmd.com/drugs/2/drug-7277/percocet-oral/details.
[21]     "Baclofen is used to treat muscle spasms caused by certain conditions (such as multiple sclerosis, spinal cord injury/disease)."  http://www.webmd.com/drugs/2/drug-8615/baclofen+oral/details.

Surgeons.  His expertise in pain medicine covers complex cases of chronic and acute pain.  He is a member of the American Society of Anesthesiologists, International Spine Interventional Society, American Society of Regional Anesthesia and Pain Medicine, and World Institute of pain.

104.    In his November 5, 2013 report, Dr. Elbaz  stated Plaintiff's back and leg pain was constant, dull, aching, sharp, shooting and burning pain was rated 8/10, and the pain was even worse with mechanical activities, including standing, sitting, bending forward, lifting and twisting, and leg pain was worse with standing and walking.  His diagnosis was lumbar radiculitis[22] caused by disc displacement.

105.    Dr. Elbaz's clinical exam findings included low back pain radiating to the left leg with numbness and tingling in the feet, muscle tenderness in the lower back, sacroiliac region, and spinous processes at the L3 through S1 levels; muscle spasms bilaterally along the lumbar paravertebral, multifidus, sacrospinals gluteus and priformis; Minor's[23] and Lasegues[24] signs; motor weakness in the knee flexors; difficulty squatting and heel toe walking.  He reported that Plaintiff's functionality was made worse with sitting, bending, lifting, standing, and walking.

106.    Because physical therapy and analgesics, then Ultram, Percocet and Baclofen, had failed to improve Plaintiff's pain, Dr. Elbaz advised a series of epidural steroid injections ("ESI") for lumbar disc displacement and lumbosacral neuritis radiculopathy.

---

[22]        Radiculitis is inflammation of the spinal nerve roots.  *Dorland's Medical Dictionary for Health Consumers.* © 2007 by Saunders.

[23]        Minor's Sign indicates lumbar-sacroiliac pathology.  http://www.medisavvy.com/minors-sign/
[24]        Lasegue's Sign is a clinical test for herniated lumbar disc disease.
http://www.ncbi.nlm.nih.gov/pubmed/3406846.

107.   On November 11, 2013, and December 18, 2013, after reporting findings the same as those from November 5, 2013, Dr. Elbaz administered an ESI, having failed conservative treatment.  Dr. Elbaz also suggested continuing physical therapy, and he prescribed Percocet.  Dr. Elbaz noted that Plaintiff also was having pain radiating into her limb.

108.   Dr. Elbaz's treatment records showed that Plaintiff's pain had gotten worse.

109.   On May 16, 2014, Dr. Williams completed an APS for Prudential.  He stated that Plaintiff's primary clinical diagnosis was fibromyalgia, and that MS was her secondary clinical diagnosis, which had been established via brain and spinal MRI testing.  Dr. Williams averred that Plaintiff would never be able to return to work, consistent with the same determination that Prudential's medical reviewer, John Leclercq, had made three years earlier, as well as Dr. Brusch, and as well as Dr. Faller.  Dr. Williams explained that Plaintiff could not work because she was unable to sit long due to pain, had difficulty following objects with her eyes, was unable to maintain a normal work schedule, and had depression.  According to WebMD, MS causes depression by destroying the insulating myelin that surrounds nerves that transmit signals affecting mood.[25]  Dr. Williams said that Plaintiff would need to be treated chronically with Tysabri,[26] Oxycodone,[27]  Tramadol,[28] Zoloft,[29] Xanax,[30] and Ambien.[31]

---

[25]      http://www.webmd.com/multiple-sclerosis/guide/ms-depression.
[26]      Tysabri is medication that is infused in an attempt to reduce the frequency of MS flare-ups and delay progression of physical disability. http://www.webmd.com/multiple-sclerosis/guide/tysabri-therapy-multiple-sclerosis.
[27]      Oxycodone is an opiate used to treat moderate to severe pain. http://www.webmd.com/drugs/2/drug-1025-5278/oxycodone-oral/oxycodone-oral/details.

110.    Depression is also a secondary condition caused by fibromyalgia,[32] which Dr. Faller's records noted, and which was brought to Prudential's attention in Plaintiff's 2009 appeal.

111.    A June 8, 2014 review by Maresi Laverriere conceded that Prudential had found Plaintiff disabled by fibromyalgia and CFS since April 15, 2008, that she had begun staying with her mother for assistance, and had recently been diagnosed with MS.  Even though all Plaintiff's doctors continued to say she could never return to work because of her fibromyalgia and CFS, and even though Prudential's Dr. Brusch and Leclercq concluded that Plaintiff's progressive fibromyalgia and CFS would never improve and rendered her disabled through "the maximum duration date of 11/15/2038,"  Laverriere said that Plaintiff's functional capacity was "unclear," and diagnostic testing was required to validate the MS.

112.    On June 23, 2014, Dr. Williams completed a CQ at Laverriere's request.  Dr. Williams concluded that Plaintiff could not work on a full time capacity, and would never be able to return to work.  He specified that Plaintiff lacked the capacity for standing and walking, and could only sit for 5 hours during an 8 hour day.

113.    On July 7, 2014, March 5, 2015, and April 2, 2015, Dr. Michael Ko administered additional ESIs, as Plaintiff's left leg radiculopathy persisted.  Dr. Ko is Dr. Elbaz's pain management partner.  Dr. Ko also completed his Pain Management

---

[28]        Tramadol, whose generic is Ultram, is used to treat moderate to moderately severe pain. http://www.webmd.com/drugs/2/drug-4398-5239/tramadol-oral/tramadol-oral/details.
[29]        Zoloft treats depression.  http://www.webmd.com/drugs/2/drug-35-8095/zoloft-oral/sertraline-oral/details.
[30]        Xanax treats anxiety.  http://www.webmd.com/drugs/2/drug-9824/xanax-oral/details.
[31]        Ambien treats insomnia.  http://www.webmd.com/drugs/2/drug-9690/ambien-oral/details.
[32]        The Court in *Kuhn v. Prudential Ins. Co.*, 551 F.Supp.2d 413 (E.D.Pa. 2008), rejected Prudential's attempt to limit LTD benefits where the plaintiff had secondary depression from fibromyalgia.

fellowship at the Manhattan Center for Pain Management at St. Luke's – Roosevelt Hospital Center in New York City, specializing in minimally invasive interventional techniques to treat a wide spectrum of acute and chronic pain conditions.  He uses a comprehensive and multimodal approach to treat both acute and chronic pain conditions, not only with injection–based treatments but also utilizing reasonable medication management, encouraging physical therapy and various other treatment modalities.  He attended the prestigious specialized high school, Stuyvesant H.S. He continued his undergraduate education at SUNY Binghamton, having graduated magna cum laude. He continued his medical school training at SUNY Downstate, and completed his residency/fellowship in Anesthesiology/Pain Management at formerly Columbia University College of Physicians and Surgeons, St. Luke's Roosevelt Hospital Center (currently Mt. Sinai – St Luke's Roosevelt).  He is also a member of the Medical Society of New York.

114.    Dr. Ko's clinical findings matched those of Dr. Elbaz, but notably, Dr. Ko also found positive Cervical Facet Loading and Spurling's[33] signs.  Dr. Ko reported that Plaintiff needed oral medication to be able to perform her daily activities and for pain relief.  Dr. Ko's diagnoses were lumbar and cervical radiculopathy and disc displacement.  He suggested that the next ESI be cervical, and prescribed Percocet and Tramadol.

115.    On July 1, 2015, Dr. Ko noted that Plaintiff was receiving steroid infusions for her MS.  As a result, he was reluctant to provide additional ESIs, which he noted had failed to provide significant relief.  Dr. Ko also added lumbar and

---

[33]        This sign indicates cervical nerve root compression. http://www.physio-pedia.com/Spurling's_Test.

cervical facet syndromes and muscle spasms to the list of Plaintiff's diagnoses. Because he could not administer more ESIs, he injected Plaintiff with lumbar blocks at the L3-4, L4-5, and L5-S1 levels.

116.    On July 15, 2014, even though Dr. Williams completed the detailed functional assessment in the CQ, Laverriere fraudulently misrepresented that Plaintiff's functional capacity was unclear, in order to manufacture an excuse to pay for an IME and surveillance to create evidence to contradict the crystal clear functional capacity that Dr. Williams provided.  Laverriere also claimed that Plaintiff's MS diagnosis had to be confirmed, which was immaterial because Prudential had already found that Plaintiff was permanently disabled by her fibromyalgia and CFS.

117.    On July 21, 2014, Prudential's nurse, Mary Ryer, claimed that Dr. Williams did not provide a clinical exam to demonstrate loss of function from the MS, even though Prudential had admitted that clinical exams do not provide evidence of functional capacity, which is why it asks doctors to complete its CQ form.  Ryer ignored that Dr. Williams provided evidence of functional loss when he completed the CQ based upon his examining Plaintiff.  Ryer claimed that she did not "fully understand" how Dr. Williams, one of the Nation's leading MS experts, made the diagnosis of MS.  If Ryer had read Plaintiff's file, then Ryer would have seen that Dr. Williams made the MS diagnosis on the basis of Plaintiff's clinical manifestations and MRI testing.

118.    Dr. Ko completed a report on August 10, 2015 that summarized his findings and conclusions.  He diagnosed Plaintiff with lumbar and cervical disc herniation, facet arthropathy, MS, fibromyalgia, and chronic fatigue.  As the

objective clinical findings, Dr. Ko said that activity increased neck and back pain, sensory and motor deficits in the extremities, and generalized pain.  Dr. Ko cited demyelination and multiple level degenerative disc disease from the cervical MRI testing, and multiple level degenerative disc disease with protrusion and facet arthropathy from the lumbar MRI testing, as the supporting diagnostic test results. Dr. Ko rated Plaintiff's pain and fatigue as severe, which frequently interfered with Plaintiff's attention and concentration, and which would be even worse if she resumed working.  Dr. Ko restricted Plaintiff to sitting 3 hours, or standing/walking 2 hours, during an 8 hour work day, which precludes any type of full time work.  Dr. Ko also stated that Plaintiff would need unscheduled 30 minute breaks every 30 minutes, which confirmed that she lacked the capacity to work on a full time basis. When asked how many days a month Plaintiff would miss because of her medical condition and treatment, Dr. Ko responded that Plaintiff was "unable to work."

119    On September 24, 2014, Prudential's "occupational medicine" doctor, Jonathan Mittleman, without identifying a single piece of medical evidence, asserted that Plaintiff's fibromyalgia, the very reason why Prudential had found her disabled for over 7 years, was not causing any restrictions.  Mittleman failed to explain how all of the evidence and reasons why Prudential had found Plaintiff disabled and paid her disability benefits for all those years, including four years under the any gainful occupation definition of disability, had miraculously disappeared.

120.   On September 25, 2014, Prudential's Steve Lambert, a "Vocational Rehabilitation Specialist," did an Employability Assessment ("EA") based on the DOT, which was nothing more than smokescreen to divert attention from the fact that Plaintiff's fibromyalgia and CFS had never improved.

121.    Prudential repeatedly admitted that Plaintiff's regular occupation was sedentary, which is the least demanding physical class of work.

122.    Prudential found Plaintiff disabled and entitled to benefits for five years under the LTD Plan's "any gainful occupation" definition, which enables Prudential to terminate Plaintiff's LTD benefits if she could perform even the easiest full time work, which is sedentary work.

123.    There was no need for an EA to determine if Plaintiff could perform any gainful occupation other than her regular occupation because sedentary work is the least demanding physical class of work.  If Plaintiff could do her regular occupation, then she could do other gainful occupations, and *vice versa*.  However, Prudential realized that if it claimed Plaintiff could resume her regular occupation, then Prudential would have to identify the medical records that showed Plaintiff's fibromyalgia and CFS improved to enable her to resume working, which Prudential knew it could not do.

124.    It made no sense to see if Plaintiff had skills that could transfer from her sedentary regular occupation to an alternate sedentary occupation, because if she could do her regular occupation sedentary work, then she would not be disabled any longer.  Prudential was simply trying to divert attention from the fact that there was no evidence that Plaintiff's  fibromyalgia or CFS had improved to enable her to resume working at any sedentary occupation on a full time basis.  Perhaps more importantly, the EA never considered if Plaintiff could stand or walk for the requisite 2 hours, and sit for the requisite 6 hours, during an 8 hour work day, which was the same reason why this court rejected the employability assessment in the *Alfano* case.

125.   On October 1, 2014, even though Laverriere noted that Plaintiff had been disabled for many years due to fibromyalgia and CFS, Laverriere asked for an IME by a "university based" neurologist.  Instead, Prudential had the IME done by William Head, Jr., who is notorious for aggressively seeking to sell his IME opinion to whomever is willing to pay for it.  When insurers use the same doctors for IMEs on a continual basis, they "becomes 'biased' because they 'lose their independence.'"  *Hangarter v. Provident Life and Acc. Ins. Co.,* 373 F.3d 998, 1011 (9th Cir. 2004).

126.   Head apparently needs to rely on doing IMEs to make a living because his patient care is poor, which rates an extremely low 1.6 out of 5 by Healthgrades, and 1.5 out of 5 by Vitals.  Typical reviews are: "I have witnessed him working hand in hand with insurance company private investigators fabricating evidence and lie about their condition to screw people who are genuinely disabled." "If you must do an IME with Dr. Head, insist on making an audio recording of the session. Expect unprofessional, disorganized and impolite office staff and extended wait times (1 hour). There were many blatant inconsistencies between his remarks during the session and his submission to the insurance company."  "Dr. Head is the most condescending, arrogant, uncaring man I have ever met. He doesn't listen to what you say and then writes a report filled with lies. One doesn't need to meet with Dr. Head because he has already decided what he is going to write about you before you open your mouth."  "He should have his license taken away.  Most IME's find in favor of the carrier but Dr. Head wages a personal war against his "victims." The shockingly independent yet consistent reviews show that Head is an insurance IME shill, who is financially dependent on taking money from insurance companies.

127.    Head is so desperate for IME work that he will even claim to be an expert psychiatrist, instead of a neurologist, which Prudential said was Head's specialty, in order to get IME work from insurance companies.[34]

128.    On October 9, 2014, because of continued clinical manifestations of MS, Dr. Williams sent Plaintiff for additional brain MRI testing.  The MRI, interpreted by Dr. Daniel Meltzer, triple board certified, including neuroradiology, concluded it was consistent with Plaintiff's history of demyelinating disease.

129.    On October 9, 2015, Plaintiff appealed the termination of her LTD benefits.

130.    Head's November 13, 2014 report claimed that Plaintiff's neurological exam was normal, and that while the MRIs confirmed that she does have MS, her clinical manifestations wax and wane.  As for Plaintiff's fibromyalgia, Dr. Head went out of his way to avoid identifying Dr. Faller as the author of June 11, 2009 and June 25, 2009 reports, and Prudential concealed Dr. Faller's October 12, 2011 report from Dr. Head.  While Prudential gave Head records from 2009 through 2013, he never explained how a single one of those records showed that Plaintiff's condition had improved so that she regained the ability to perform full time sedentary work.

131.    In December 2014, Dr. Williams sent Plaintiff for additional MRI testing of her brain, cervical and thoracic spine, but none of the three MRIs revealed any improvement in the demyelinating or orthopedic disease.

132.    After paying Head $2,775.00 for the IME, Laverriere was unhappy with it because Head corroborated Plaintiff's MS diagnosis.  Therefore, on January 20,

---

[34]    http://lwd.dol.state.nj.us/labor/wc/legal/cases/gorrell.html.

2015, Laverriere asked Head nine leading questions, which pretended Prudential had never found Plaintiff disabled because of fibromyalgia and CFS, and paid Head an additional $495.00.

133.   On February 16, 2015, Head answered the nine leading questions.

a.   Head concluded that there was no evidence of functional impairment despite the fact that Dr. Williams, an MS expert, explained that the objective diagnostic MRI testing justified Plaintiff's functional impairment.

b.   Head said that Plaintiff's "self reported" functional capacity was inconsistent with normal neurological exam findings, even though that assertion contradicted his own statement that Plaintiff's MS findings waxed and waned. Head's use of the term "self reported" is consistent with a biased report because that is a term used only by insurance companies in an attempt to mitigate the importance of a claimant's subjective statements, even though the courts have always rejected attempts to minimize the significance of claimant's statements, especially their reports of pain.  *Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127 (2d Cir. 2001)(complaints of pain cannot be dismissed as subjective because pain is an important factor to be considered in determining disability*).* "However, decreased range of motion and/or sensory impairments are not symptoms of fibromyalgia, and the absence of these non-symptoms thus does not reflect on the presence or severity of fibromyalgia."  *Tempesta v. Astrue,* 2009 WL 211362 at *6 (E.D.N.Y. Jan 28, 2009).  Even if Plaintiff had normal neurological findings, that would still be consistent with a decreased functional capacity from fibromyalgia, which Head failed to address.  As *Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003), made clear:

**the absence of swelling joints or other orthopedic and neurologic deficits "is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced**." *Sarchet*, 78 F.3d at 307.  Rather, these negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating "other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue." *Preston*, 854 F.2d at 819.

  c. Head claimed there was a lack of objective evidence of neurological pathology to support restrictions or limitations, but his original IME stated that the MRI testing provided objective evidence of neurological pathology, which is why he concluded Plaintiff had MS.  Head's completely reversing his opinion about Plaintiff having MS, without any explanation other than his getting paid $495, shows that Head's opinion is not worth the money he was paid for it.

  d. Head now said that there was "questionable" evidence of Plaintiff's MS on MRI testing, but Head did not equivocate at all about the MRI testing establishing Plaintiff's MS when he issued his original report.  Once again, the only difference is that Prudential paid Head another $495.

  e. Even though Head admitted he was not a rheumatologist, he erroneously asserted that Plaintiff was not impaired because fibromyalgia and CFS "are subjectively reported disorders that cannot be diagnosed via objective testing measurements."  That is exactly what Prudential's 2008 Wasser IME had said: "Her pain syndrome is self-reported and it is difficult to substantiate by objective testing and does not result in functional impairment.  Thus, while Prudential rejected that explanation six years ago when Wasser made it, Prudential now accepted it when Head made it.  Head failed to explain how Plaintiff's fibromyalgia and CFS, which Prudential said precluded Plaintiff from doing sedentary work, had improved.  Head also failed to explain why Prudential now rejected its own IME opinion from Dr.

Brusch, the opinion of Dr. Faller, the opinion of Dr. Williams, the opinion of Dr. Ko, as well as the opinion of Prudential's John Leclercq, who concluded Plaintiff was disabled from sedentary work.  Head's assertion was wrong because fibromyalgia can be objectively diagnosed based upon the American College of Rheumatology trigger point test (the "ACR test").  *Eisner v. Prudential,* 10 F.Supp.3d 1104 (N.D.Cal. July 29, 2013)("Prudential's self-reported symptoms limitation" does not apply to fibromyalgia, which is diagnosed using the ACR test); *Lanoue v. Prudential,* 20098 WL 3157545 (*D.Conn. Sept. 25, 2009); Morgan v. Unum Life*, 2002 WL 31095391 (D.Minn. 2002); *Russell v. Unum Life Ins.,* 40 F.Supp. 747 (D.S.C. 1999); *Conrad v. Continental Cas*., 232 F.Supp.2d 600 (E.D.N.C. 2002).

134.    In addition to the $2,775.00 and $495.00, Prudential paid Head yet another $1,300 on March 3, 2015, for a grand total of $4,470.

135.    On March 6, 2015, Laverriere asked Dr. Williams if he agreed with the Head IME, and if not, for the medical reasons that supported his answer.  Laverriere had predetermined to ignore whatever Dr. Williams had to say if it supported Plaintiff's claim, as Prudential had already rejected what Dr. Williams had to say in both the APS and CQ they asked him to complete, which showed Plaintiff had a less than sedentary work capacity.

136.    On March 15, 2015, Dr. Williams rejected Head's opinion, stating, "I do not agree with the IME performed for Ellen Kostas," and then gave numerous reasons why Plaintiff was disabled by severe pathological fatigue, weakness, and pain.

a.    Contrary to Head's assertion, Dr. Williams explained that there were objective findings of optic neuritis, motor changes on examination, and brain

and spinal cord lesions shown on the MRIs that established Plaintiff's MS.  Dr.
Williams pointed out that Head overlooked or purposely ignored that Plaintiff
developed optic neuritis in January 2013, which was diagnosed by findings of avid
diffuse enhancement of the right optic nerve on the January 17, 2013 MRI, as well
as an afferent pupillary defect found during his initial February 14, 2013 exam.

b.      Next, Dr. Williams explicated that Plaintiff's brain MRI's
revealed broad based periventricular lesions abutting the lateral ventricles as well
as corpus callosum lesions.  The radiologist concluded the MRI "is considered
virtually characteristic of demyelinating disease," to which Dr. Williams concurred.
At the same time, the cervical spine MRI's showed multiple cervical spine lesions.
The July 11, 2013 MRI showed lesions at left C3, right C4-C6, left C5, and left C7
levels.  Dr. Williams explained that spinal cord demyelination can be a major cause
of disability, which any competent neurologist knows.  He pointed out that his initial
exam notes reflected that Plaintiff's cervical spine lesions and hip weakness led him
to prescribe aggressive treatment from the onset.

c.      Dr. Williams explained that a patient with optic neuritis and
numerous plaques, typical in shape and location in their brain and cervical spine, should
be considered to have MS unless another diagnostic entity can be proven, and that
lesions in the cervical spine and corpus callosum are clearly pathologic.  Not
surprisingly, Head never proved, let alone offered, another diagnosis.  Dr. Williams
emphasized that Plaintiff clearly had MS, which often causes a disabling degree of
motor and mental fatigue and pain.

d.      After pointing out that Plaintiff had a significant number of cervical
spine lesions, Dr. Williams further explained that much of the disease burden in MS is
hidden on conventional MRI, so that while the MRI can help establish proof of the

disease, it cannot reveal the whole burden of the disease.  Once again, one would expect a neurologist to know this, yet Head did not, even though it "is well established in the MS literature."  Dr. Williams described how MS injures the whole central nervous system, causing both focal symptoms and MRI lesions, as well as diffuse symptoms such as fatigue, cognitive impairment, alterations to normal appearing white matter, and diffuse injuries to the cortex.  Physiologically, Dr. Williams elucidated that MS alters energy metabolism by causing significant increases in energy demands of demyelinated axons, while also injuring the power sources of the cells, the mitochondria.  Dr. Williams explained that it is the norm to be able to know that someone has MS, yet not be able to "see" all of their brain alterations on MRI.  It is extremely difficult to explain how Head, a self-professed neurologist, did not know that.

   e. Dr. Williams concluded his report by stating that Plaintiff "has clear definite evidence of MS.  Her symptoms of fatigue, pain and motor fatigability are commonly seen with MS."  He then emphasized that MS is not Plaintiff's only medical problem, and that she continues to suffer from "a pain syndrome with trigger points that her rheumatologist has diagnosed as fibromyalgia."  Therefore, Dr. Faller and Dr. Williams "optimized therapy targeting MS as well as fibromyalgia but unfortunately she remains disabled."  Thus, Dr. Williams' report demonstrated that Plaintiff has MS, continues to suffer from fibromyalgia, and remains incapable of full time work.

  137. On March 27, 2015, after reading Dr. Williams' March 15, 2015 response to the Head IME, Prudential's Dr. Mittelman agreed with the "compelling case" that Dr. Williams made for the MS diagnosis.  However, Mittelman now claimed that Dr. Williams failed to identify objective findings to support his conclusion that Plaintiff remained disabled by MS, even though the Policy does not require objective findings, and Dr. Williams had described the supporting objective medical evidence in detail.  In any case, it was irrelevant if Plaintiff were not disabled by MS because she remained disabled by fibromyalgia and CFS.

138.   On April 28, 2015, Lambert was asked if his EA remained valid based solely on Mittelman's March 27, 2015 statement that there was no objective medical information to support any restrictions or limitations for Plaintiff.

**Prudential Terminates Plaintiff's LTD Benefits**

139.   On April 15, 2015, relying solely on the Head IME, Laverriere sent Plaintiff a letter terminating her LTD benefits as of May 1, 2015, in the absence of a single piece of medical evidence that showed Plaintiff's fibromyalgia or CFS had improved, and even though Dr. Williams had refuted the Head IME, so that even Mittelman rejected its conclusion that questioned the MS diagnosis.

140.   Laverriere stated that the Head IME said Plaintiff had a normal stance, gait, no kyphosis, scoliosis, lordosis, or arthritic hand changes, but those findings are irrelevant to her MS and back pain.  Laverriere ignored the irrefutable objective evidence supporting Plaintiff's severe back pain, including multilevel degenerative disc disease, a disc protrusion at the T12-L1 level, foraminal stenosis, facet arthropathy from the L4-S1 levels, and a protruding disc at the L5-S1 level that abutted the S1 nerve root. The findings Laverriere recited, such as there supposedly being no atrophy or reduced range of motion, and normal grip strength, also bore no relevance to fibromyalgia.

141.   Next, Laverriere stated that Plaintiff did not require orthopedic devices or another person to help her walk.  However, the LTD Plan's definition of disability for Plaintiff was not whether she is incapable of walking, only that she cannot walk for 2 hours out of 8 hours, and Prudential had found that Plaintiff had been unable to do so since 2006.

142.   Then, although Head is unqualified to administer cognitive testing, Laverriere relied on his IME as evidence that Plaintiff supposedly had no cognitive problems, even though Plaintiff has been disabled due to pain and fatigue from fibromyalgia and CFS, and now MS as well, but not cognitive loss.

143.   Laverriere then claimed that there "was no objective evidence of any underlying neurological condition or disorder as the physical exam was normal." However, even if true, which it was not, Head said Plaintiff's MS symptoms wax and wane.  More importantly, Dr. Williams identified objective MRI and clinical evidence of Plaintiff's underlying demyelinating neurological condition.  In his March 15, 2015 letter, Dr. Williams specified that, "Ellen has multiple sclerosis by objective findings of optic neuritis, motor changes on examination, and MRI lesions of the brain and spinal cord."

144.   Laverriere noted that Head reviewed Plaintiff's brain and spinal cord MRIs, BUT LAVERRIERE THEN COMPLETELY FAILED TO SAY A SINGLE WORD ABOUT WHAT THEY REVEALED.  While Laverriere claimed that Dr. Williams did not identify any objective medical evidence in his response, he pointed out that Plaintiff's optic neuritis was diagnosed by findings of avid diffuse enhancement of the right optic nerve on the January 17, 2013 MRI, and that the brain MRI's revealed broad based periventricular lesions abutting the lateral ventricles as well as corpus callosum lesions, which "is considered virtually characteristic of demyelinating disease."  Furthermore, the July 11, 2013 MRI showed spinal lesions at left C3, right C4-C6, left C5, left C7 levels, and Dr. Williams explained that spinal cord demyelination is a major cause of disability, which any competent neurologist knows.  Even Dr. Mittelman agreed that Dr. Williams made a "compelling" case.  Laverriere failed to identify any other objective evidence that Dr. Williams could possibly have provided.

145.   Laverriere rejected Plaintiff's subjective evidence in a single boilerplate sentence: "It was noted that your self-reported functional capacity is not consistent with the normal neurological findings," but Dr. Williams refuted Head's misrepresentation that Plaintiff had "normal neurological findings," and such findings would also be irrelevant to

fibromyalgia.

146.    Laverriere rejected Plaintiff's credibility, but failed to state how her statements were supposedly inconsistent.  Laverriere failed to identify any evidence to question the reliability of any of Plaintiff's complaints relating to her fibromyalgia, CFS and back pain as well.

147.    Laverriere's final comment about the medical evidence was that Dr. Williams did not address Plaintiff's functional capacity in his March 15, 2015 response to the Head IME, but there was no reason for him to do so because he had already provided his assessment when completing Prudential's CQ.  Dr. Williams not only stated that Plaintiff lacked the ability to stand or walk for the requisite 2 hours a day, but also lacked the ability to sit for the minimal 6 hours a day due to MS.

148.    Laverriere addressed the vocational evidence by discussing transferrable skills, but there was no need for a transferable skill analysis ("TSA") because Prudential admitted that Plaintiff's regular occupation was sedentary, which is the least demanding physical class of work.  The SSA definition of transferable skills is the national standard,[35] which is based on the *DOT*.[36] Transferability of skills is only at issue if the claimant cannot perform her past work.[37]  By having a TSA done, Prudential admitted that Plaintiff remained unable to resume her past work.  Since Plaintiff's past work was sedentary, Prudential admitted that Plaintiff could not do sedentary work.  There was no need to  determine if Plaintiff could do any alternate jobs because there are none that are easier to do than her past sedentary occupation.  Prudential's admitting that it needed an EA because Plaintiff could not perform sedentary work, is an admission that

---

[35]     https://skilltran.com/index.php/support-area/documentation/96-support-tsa-defined.
[36]     http://en.wikipedia.org/wiki/Transferable_skills_analysis.
[37]     http://www.socialsecurity.gov/OP_Home/rulings/di/02/SSR82-41-di-02.html.

Plaintiff remained disabled from any alternate work.

149.    Laverriere concluded that there was no objective evidence to support Plaintiff's symptoms.  Laverriere failed to identify a single piece of objective evidence that Prudential agreed had supported finding Plaintiff disabled for seven years, but which had changed and no longer supported.  Laverriere failed to identify a single piece of objective evidence that showed Plaintiff's fibromyalgia improved.  Laverriere failed to identify a single piece of objective evidence that showed Plaintiff's CFS improved. Laverriere failed to identify a single piece of objective evidence that refuted Dr. Williams' recitation of the objective evidence supporting that Plaintiff is disabled by MS. Laverriere did not address Plaintiff's back pain either, even though that was one of the three reasons why John Leclercq stated that Plaintiff was permanently disabled in 2011, and his conclusion was rendered before the treatment by Dr. Ko and his opinion that Plaintiff also lacked a sedentary work capacity.  Two years later, because of her continued back pain and left sciatica, Dr. Williams sent Plaintiff for the lumbar spine MRI on August 1, 2013, which revealed multilevel degenerative disc disease, a disc protrusion at the T12-L1 level, foraminal stenosis, facet arthropathy from the L4-S1 levels, and a protruding disc at the L5-S1 level that abutted the S1 nerve root. Laverriere's summary also disregarded the SSA award by arguing it had a different standard, but the SSA standard is the same as the LTD Plan definition, the inability to do any work, and the SSA has not terminated Plaintiff's SSD.

**The Appeal Showed Plaintiff Remained Disabled From Sedentary Work**

150.    On October 9, 2015, Plaintiff appealed Prudential's termination of her LTD benefits.

151.    The gist of Plaintiff's appeal was that while Prudential terminated Plaintiff's

LTD benefits in the absence of evidence that showed an improvement in either her fibromyalgia or CFS during the past seven years, the only thing that had changed was that she started to exhibit symptoms from MS too.

152.    Plaintiff submitted updated medical evidence to prove that she remained incapable of performing full time sedentary work because of her medical conditions.

**Dr.  Faller**

153.    Prudential admitted that a rheumatologist "is the most appropriate specialist for symptoms of fibromyalgia," and on more than one occasion stated that Dr. Faller is a "renowned" rheumatologist.

154.    After re-examining Plaintiff, Dr. Faller completed an Impairment Questionnaire ("IQ") that confirmed there had been no medical improvement.  Dr. Faller's June 19, 2015 IQ diagnosed Plaintiff with fibromyalgia, MS, CFS, and sleep disorder, which is closely associated with fibromyalgia.[38]  Objective clinical findings included trigger points, cushingoid features from the steroids used to treat the MS,[39] sensory loss in the right foot, and asymmetric eye movements.  He stated that Plaintiff's neck, back, leg, and hip pain and fatigue would be even worse if she resumed working, and they would frequently interfere with her attention and concentration.  During an 8 hour work day, Dr. Faller restricted Plaintiff to sitting for 3 hours, or standing/walking 2 hours.

155.    In a July 14, 2015 report, Dr. Faller also stated that he transferred Plaintiff's care to Dr. Williams after she developed extensive demyelination in both her brain and spinal cord as a result of MS.  Dr. Faller confirmed that he was the person

---

[38]     http://www.webmd.com/fibromyalgia/guide/fibromyalgia-and-sleep
[39]     http://www.physio-pedia.com/Cushing's_Syndrome

who referred Plaintiff to the MS medical group when she developed severe optic neuritis.

**Dr. Stein**

156.   Although Head was provided with the records from Dr. Stein, Head's IME failed to comment on them.  It was Dr. Stein's May 19, 2009 EMG-NCS testing that yielded abnormal results, after Walles had stated that such testing was needed to substantiate Plaintiff's functional loss.  Head never addressed Dr. Stein clinical findings, electrodiagnostic test data, or opinion.

157.   Even though fibromyalgia and cervical radiculopathy are chronic and progressive conditions, Dr. Stein completed an IQ on July 14, 2015.  Dr. Stein rated Plaintiff's pain as severe and fatigue as moderately severe, which he said constantly interfered with her attention and concentration, and would be even worse if she resumed working.  In an 8 hour day, Dr. Stein restricted Plaintiff to sitting or standing/walking for 2 hours, and only lifting/carrying between 0 and 5 pounds.

158.   Dr. Stein conducted updated EMG testing on August 11, 2015, which revealed that Plaintiff also has carpal tunnel syndrome in addition to cervical radiculopathy at the C5-8 levels.

**Dr. Levine**

159.   The Head IME also disregarded the records from Dr. Levine.   Although there is no diagnostic test for CFS or fibromyalgia, Dr. Levine stated that the objective laboratory results showed Plaintiff tested positively for Epstein Barr Virus, Human Herpes Virus 6, and had low levels of IGF-1 and pneumococcal antigens, which are associated with CFS and fibromyalgia patients.  Dr. Levine diagnosed Plaintiff with fibromyalgia and CFS, which she noted overlap in about 70% of the time.

160.   Even though CFS is an incurable condition, Dr. Levine completed a report on August 7, 2015, which confirmed that Plaintiff remained unable to work because of profound weakness, fatigue, malaise, cognitive dysfunction, and unrefreshed sleep, all of which are typical of disabling CFS and fibromyalgia.  Dr. Levine highlighted that Head's claim, that Plaintiff stopped being disabled because he questioned the MS diagnosis, was misleading because it failed to address her main disabling disorders of CFS and fibromyalgia.  Dr. Levine pointed out that CFS is linked to MS "because of the chronic immune activation."

161.   Dr. Levine provided results from updated laboratory testing.  That objective medical evidence showed that Plaintiff had an active infection of Epstein Barr Virus and Human Herpes Virus 6, both of which are incurable.  To avoid any misinterpretation of her expert opinion, Dr. Levine stated that Plaintiff "continues to remain disabled."  Importantly, Dr. Levine pointed out that Plaintiff "is extremely unlikely to recover" from her CFS, MS and fibromyalgia.

162.   Dr. Levine also completed an IQ on August 7, 2015, which summarized her objective and subjective medical findings and opinions.  She rated Plaintiff's pain and fatigue as severe, said they interfere with her attention and concentration constantly, and concluded that they would be even worse if Plaintiff tried to resume working.  Among other things, during an 8 hour day, Dr. Levine limited Plaintiff to sitting and standing/walking for less than 1 hour, and occasionally lifting/carrying between 6 and 9 pounds.  Dr. Levine stated that Plaintiff would need a 30 minute break every hour, but added that the questions are not actually applicable because Plaintiff is not able to work.

**Dr. Williams**

163.    Head claimed that Plaintiff did not have MS, and said she could work because there was no objective evidence of functional limitations caused by the MS. Notwithstanding the fact that the Head IME ignored the fact that Plaintiff remained disabled by her fibromyalgia, CFS, and back pain, which is why Prudential failed to identify any evidence that any of those medical conditions improved, Dr. Williams' March 15, 2015 narrative report identified a great deal of supporting objective evidence.

164.    In his July 28, 2015 report, Dr. Williams made clear that the only reason why he did not provide functional limitations in his March 15, 2015 letter was because Prudential did not ask him to provide functional limitations, and he had already provided Plaintiff's functional limitations in the June 23, 2014 CQ that Prudential asked him to complete.  To avoid any possible misinterpretation, Dr. Williams completed another questionnaire that provided restrictions and limitations for Plaintiff.

165.    Prudential's termination letter stated, "There was no objective evidence of any underlying neurological condition or disorder as the physical exam was normal." Dr. Williams explained that Prudential's assertion was wrong for two reasons.  First, his report March 15, 2015 letter stated that there were "MRI lesions of the brain and spinal cord."  More specifically, the letter pointed out that Plaintiff's "brain MRI's reveal broad based periventricular lesions abutting the lateral ventricles as well as corpus callosum lesions.  The radiologist's report from the January 17, 2013 brain MRI states, "The appearance is considered virtually characteristic of demyelinating disease.  I concur," making it absolutely clear that the objective established that Plaintiff had demyelinating disease, that is, an underlying neurological condition or disorder.

166.    Dr. Williams explained that the second reason why Prudential's assertion was wrong was that his March 15, 2015 letter stated that Plaintiff, "has multiple sclerosis by objective findings of optic neuritis, motor changes on examination."  More specifically, he pointed out that Plaintiff developed optic neuritis in January 2013.  "She had diagnostic findings of avid diffuse enhancement of the right optic nerve on the 1/17/13 MRI and an afferent pupillary defect on my initial exam 2/14/2013."  Dr. Williams elaborated, "Any neurologist knows that optic neuritis is highly associated with multiple sclerosis," a disease that causes inflammation and damage to nerves in your brain and spinal cord."[40]  Dr. Williams added that, "To be very clear, in case someone is waffling about her MS diagnosis, there are no benign diagnoses for a patient with optic neuritis and spinal cord demyelination."

167.    Dr. Williams explained that the diagnostic and clinical findings provided objective evidence that Plaintiff has MS, and that the examination findings from her physicians show that she had been experiencing pain, fatigue, numbness and tingling, weakness, muscle spasms and stiffness, cognitive dysfunction, and vision problems. While many of those symptoms may be associated with Plaintiff's fibromyalgia, CFS, and back impairments, they are also associated with MS.[41]

168.    Dr. Williams' July 29, 2015 report emphasized that Plaintiff's medical conditions are progressive, the restrictions and limitations from her medical conditions that Prudential found disabled her from working in the past never changed, and certainly had not improved, because she had also begun experiencing symptoms from MS.  Dr. Williams explained, "Please remember that Ms. Kostas was diagnosed with MS in

---

[40]    http://www.mayoclinic.org/diseases-conditions/optic-neuritis/basics/definition/con-20029723.
[41]    http://www.nationalmssociety.org/Symptoms-Diagnosis/MS-Symptoms

addition to her other medical conditions, including fibromyalgia, chronic fatigue syndrome, and lumbar impairments.  Those medical conditions did not improve just because Ms. Kostas also became afflicted with MS."

169.    On October 8, 2015, Dr. Williams completed an IQ along with his narrative report.  Dr. Williams identified MRI testing, hip pain and weakness, impaired tandem walking, brisk reflexes, and straight leg raises as objective medical evidence of Plaintiff's medical conditions.  Importantly, Dr. Williams stated if Plaintiff resumed working, her fatigue would increase that day and the next day as well.  The IQ limited Plaintiff to sitting 2-3 hours, and walking/standing less than 1 hour, during an 8 hour workday, and also from lifting/carrying any amount of weight for up to a third of the work day.

**MS IME**

170.    On September 25, 2015, in an attempt to expedite a reinstatement decision, Plaintiff went for an independent medical examination by a board certified neurologist named Itzhak C. Haimovic, who also reviewed Plaintiff's medical records.

171.    Dr. Haimovic stated that Plaintiff developed MS, verified by objective diagnostic MRI testing, in addition to being afflicted with longstanding CFS and fibromyalgia.  Dr. Haimovic concluded that Plaintiff's "overwhelming symptoms of fatigue are clearly related to multiple sclerosis;" *i.e.*, fatigue "is a well-known phenomena in patients with multiple sclerosis," especially those with "multiple lesions and multiple sclerosis."

172.    Dr. Haimovic also addressed Plaintiff's visual problems.  He said that Plaintiff's difficulties staring in the computer screen most likely represent Uhthoff phenomenon, which is manifested by visual disturbances associated with bright lights.

173.   Based upon his examination and review of the records, Dr. Haimovic concluded that Plaintiff's symptoms are "severe," related to MS for which there is objective documentation, and "are chronic and permanent."

174.   Dr. Haimovic completed an IQ on October 8, 2015.  He diagnosed Plaintiff with MS and CFS, which Dr. Haimovic stated resulted in severe fatigue, generalized weakness, and severe tingling and numbness in the extremities.  During an 8 hour workday, Dr. Haimovic limited Plaintiff to sitting or standing/walking for less than 1 hour, lifting/carrying somewhere between 0 and 5 pounds for up to a third of the time, and never using her right hand for handling, grasping, turning or twisting objects, fingering or fine manipulation.

**Pain Physicians NY - Dr. Elbaz and Dr. Ko**

175.   As pain management specialists, Dr. Elbaz and Dr. Ko are uniquely qualified to evaluate the impact that pain has on Plaintiff's functionality.

176.  Updated records from July 7, 2014, March 5, 2015, and April 2, 2015, showed that Dr. Ko administered additional ESIs, as Plaintiff' left leg radiculopathy persisted.  Dr. Ko's clinical findings matched those of Dr. Elbaz, but notably, Dr. Ko also found positive Cervical Facet Loading and Spurling's[42] signs.  Dr. Ko reported that Plaintiff needed oral medication to be able to perform her ADLs and for pain relief.  Dr. Ko's diagnoses were lumbar and cervical radiculopathy and disc displacement.  He suggested that the next ESI be cervical, and prescribed Percocet and tramadol.

---

[42]       This sign indicates cervical nerve root compression. http://www.physio-pedia.com/Spurling's_Test.

177.    On July 1, 2105, Dr. Ko noted that Plaintiff was receiving steroid infusions for her MS.  As a result, he was reluctant to provide additional ESIs, which he noted had failed to provide significant relief  Dr. Ko also added lumbar and cervical facet syndromes and muscle spasms to the list of diagnoses.  Because he could not administer more ESIs, he injected Plaintiff with lumbar blocks at the L3-4, L4-5, and L5-S1 levels.

178.    Dr. Ko completed an IQ on August 10, 2015 that summarized his findings and conclusions.  He diagnosed Plaintiff with lumbar and cervical disc herniation, facet arthropathy, MS, fibromyalgia, and chronic fatigue.  He cited as the objective clinical findings, that activity increased neck and back pain, sensory and motor deficits in the extremities, and generalized pain.  Dr. Ko cited demyelination and multiple level degenerative disc disease from the cervical MRI testing, and multiple level degenerative disc disease with protrusion and facet arthropathy from the lumbar MRI testing, as the supporting diagnostic test results.  Dr. Ko rated Plaintiff's pain and fatigue as severe, that frequently interferes with her attention and concentration, and would be even worse if she resumed working.  Dr. Ko restricted Plaintiff to sitting 3 hours, or standing/walking 2 hours, during an 8 hour work day. Dr. Ko also stated that Plaintiff would need unscheduled 30 minute breaks every 30 minutes, which confirms that she lacks the capacity to work on a full time basis. When asked how many days a month Plaintiff would miss because of her medical condition and treatment, Dr. Ko responded that Plaintiff is "unable to work."

179.    Thus, seven physicians who specialize in fibromyalgia, CFS, MS and pain syndromes: Dr. Faller, Dr. Stein, Dr. Levine, Dr. Ko, and Dr. Williams, and IME Dr. Haimovic and IME Dr. Brusch, all stated that Plaintiff lacks the ability to perform

sedentary work, and that her condition would not improve.  That fact was so obvious that even before treatment by Dr. Williams and Dr. Ko, Prudential's John Leclercq had already concluded that Prudential should pay Plaintiff LTD benefits for the Policy's maximum duration.

180.    On October 14, 2015, Billines sent a letter stating:

> In the event that Ms. Kostas has been seen for an independent medical exam as part of the application process for Social Security Disability, please notify our office as soon as possible and/or provide us with a copy of the results for review.  If Ms. Kostas has or plans to submit additional documentation to Social Security as part of her application she has not yet submitted to our office, please send a copy to us.

181.    Plaintiff was never seen for an independent medical exam as part of the application process for SSD, which benefits had already been approved.

182.    As Plaintiff's SSD application was completed before 2015, Plaintiff had no plans to submit any additional documentation to Social Security.

183.    Plaintiff continues to receive SSD benefits.  Thus, in addition to Dr. Faller, Dr. Stein, Dr. Levine, Dr. Ko, and Dr. Williams, and IME Dr. Haimovic and IME Dr. Brusch, as well as John Leclercq and Vocational Expert Leopold, the SSA also concluded that Plaintiff remains incapable of performing sedentary work.

**Prudential Upheld Its Termination**

184.    By letter dated January 21, 2016, Billines upheld Prudential's termination of benefits by rejecting the findings and conclusions of Dr. Faller, Dr. Stein, Dr. Levine, Dr. Ko, Dr. Williams, Dr. Brusch, Dr. Haimovic, John Leclercq, Vocational Expert Leopold, and the SSA, purportedly in favor of Head, who found Plaintiff "consistently reports of pain and fatigue and a sensation of generalized weakness," and a January 6, 2016 IME by a Dennis Miller, a neurologist, not a rheumatologist, who claimed Plaintiff

does not have fibromyalgia.

185.    Because all of the treatment records, diagnostic testing, the opinions of Plaintiff's physicians, Dr. Brusch, Dr. Haimovic, and the SSA continued to show no change in Plaintiff's medical condition and that she remained disabled, and because Dr. Williams and Dr. Haimovic rebutted Head's review, Prudential sent Plaintiff for another IME.

186.    On January 6, 2016, Prudential had Plaintiff examined by Dennis Miller, who said he was an infectious disease specialist.

187.    Miller stated that he did not perform neurologic or orthopedic tests because it was outside the realm of his expertise.  While Miller admitted that he was unqualified to evaluate neurologic or orthopedic matters, he inexplicably failed to state that he was also unqualified to evaluate rheumatologic matters.

188.    Despite being unqualified to address neurologic matters, like MS, or rheumatologic matters, like fibromyalgia, Miller proclaimed that the two conditions were almost identical, even though no medical treatise or organization has stated such an assertion.  Miller purposely misquoted the CDC description of fibromyalgia in order to make it appear more like MS.  The CDC states that "Fibromyalgia is a condition that causes widespread pain, sleep problems, fatigue, and often psychological distress." Miller ignored that, and instead, identified some of the secondary symptoms that "may also" occur.  Miller also disregarded that the CDC says it relies on the ACR criteria to diagnose fibromyalgia, which is based solely on pain.

189.    In a bizarrely illogical or ignorant statement, Miller asserted that Plaintiff does not have fibromyalgia since the cause of fibromyalgia is unknown.

190.    Equally illogical, Miller then contradicts himself and said that Plaintiff has

"MS, however, the diagnosis of multiple sclerosis is outside my realm of specialty and I cannot comment with any dubious certainty that she does have multiple sclerosis." Therefore, Miller stated that Plaintiff's MS needed to be addressed by a neurologist.

191.    If Miller had actually reviewed the thousand or so pages of Plaintiff's medical records, then he would have known that Dr. Williams, an MS expert, had addressed Plaintiff's MS.  Similarly, Miller would have known that Dr. Haimovic, also a neurologist, had examined Plaintiff.  In fact, Miller's comment shows that he did not even read Head's review, even though Prudential paid Head specifically to address Plaintiff's MS.

192.    Miller's evaluation of Plaintiff's CFS further reveals that his review was cursory at best.  Miller claimed that from an infectious disease perspective, there was no ""objective" evidence to explain Plaintiff's symptoms.  If Miller had actually reviewed Plaintiff's medical records, then he would have seen Plaintiff's laboratory tests and Dr. Faller's reports regarding Plaintiff's EBV.  Moreover, Miller would have seen Dr. Levine's reports that detailed the objective clinical and laboratory findings from an infectious disease perspective that explained Plaintiff's CFS.

193.    Purportedly based on the Head and Miller IMEs, Prudential upheld the termination of Plaintiff's LTD benefits, despite failing to identify a single medical record that showed her condition had changed, let alone improved.

194.    After having found Plaintiff incapable of lifting the 10 pounds required to do sedentary work during the prior seven years, Prudential's termination letter claimed that Plaintiff could now lift 20 pounds, even though Prudential never identified a single objective test or clinical finding that had changed, let alone improved.

195.    Prudential's termination letter never gave the name of a doctor who

claimed Plaintiff could suddenly lift 20 pounds because neither Head nor Miller said so. In fact, Miller said that he could not comment on how fibromyalgia or MS would affect Plaintiff's ability to sit, stand, or walk either.[43]

196.    The only reference in Plaintiff's 1719 page file that she could lift 20 pounds is from an October 30, 2015 "review," which predated the Miller exam, by a doctor named Edward Collins, who is a Prudential employee.  Collins addressed Plaintiff's fibromyalgia by saying Plaintiff could lift 20 pounds because she had "normal muscle strength with detailed manual muscle testing."  Collins failed to explain why Prudential concluded for seven years that Plaintiff could not even lift the 10 pounds for sedentary work despite having normal muscle strength with detailed manual muscle testing.  Collins failed to identify a single clinical exam finding or diagnostic test that supposedly showed Plaintiff's fibromyalgia had changed over the previous seven years.  In fact, Collins failed to explain why normal muscle strength with detailed manual muscle testing bore any relevance to fibromyalgia since, as the Second Circuit made clear in *Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003):

**the absence of swelling joints or other orthopedic and neurologic deficits "is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced**."  *Sarchet*, 78 F.3d at 307.  Rather, these negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating "other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue."

197.    Dr. Faller, Dr. Levine, Dr. Ko, Dr. Stein, Dr. Williams, IME Brusch, Dr. Haimovic, the SSA, Vocational Expert Leopold, all specified that Plaintiff could not lift 20 pounds.  Neither Head nor Miller opined Plaintiff could lift 10 pounds, let alone 20

---

[43]  Prudential also ignored that a one time exam could not evaluate Plaintiff's fatigue because, as Dr. Williams explained from an MS perspective, it could not account for post-exertional fatigue.

pounds.

198.    The sole support for Prudential's termination is the aberrant and unsupported assertion of Collins, who never examined Plaintiff.  To make matters even worse, Prudential upheld its termination based upon the Collins' alleged review of the medical records, including the Miller IME, even though the Miller IME did not exist when Collins completed his review.

199.    Even though Prudential previously specified that it needed a physician who specializes in rheumatology to evaluate Plaintiff's fibromyalgia, Billines upheld the termination of Plaintiff's LTD benefits without an opinion from any rheumatologist that Plaintiff's fibromyalgia had improved.

200.    "Nevertheless, having been previously warned that fibromyalgia is not an organic disease that can be diagnosed on the basis of objective findings, Prudential still adopted [its doctor's] conclusion that [Plaintiff's] chronic pain was not documented by any objective findings," even though "Prudential has been warned that it cannot reject fibromyalgia claims for lack of objective evidence."  *Morgan v. Prudential Ins. Co. of Amer.,* 755 F.Supp.2d 639, 647, 649 (E.D.Pa. 2010).

201.    Billines concluded that, "Overall, the documentation supports Ms. Kostas retains the residual physical capacity to lift up to 20 pounds occasionally, or 10 pounds frequently," even though only Miller stated that.

202.    Billines never explained what medical records showed that Plaintiff's medical conditions had improved to increase her ability to lift from less than 10 pounds to 20 pounds.

203.    One possible reason why Prudential terminated Plaintiff's LTD benefits is that it maintains a global scheme for rejecting fibromyalgia claims, which

is supported by countless federal court decisions reversing such claims, and is the type of organizational misconduct that led to Unum and CIGNA being compelled to reassess hundreds of thousands of its claim denials and terminations.

204.   The other possible reason why Prudential may have terminated Plaintiff's benefits is the assumption that she is lying about the severity of her condition in order to secure benefits.  However, that assumption requires Prudential to explain why Plaintiff was credible during the seven years when her benefits were approved, but was no longer credible as of May 1, 2015. Moreover, the assumption also requires finding that all of Plaintiff's doctors, Dr. Brusch, Dr. Haimovic, John Leclercq, the SSA, and Vocational Expert Leopold are all complicit in this deception. Furthermore, it fails to explain why Plaintiff, who enjoyed her work, and earned an annual salary over $100,000, suddenly changed her mind and then decided that she longer liked working or the opportunity for increasing compensation.  To the contrary, logic dictates that someone in Plaintiff's position would try to continue for working as long as possible.  And that is precisely what the facts show about her continuing to work for as long as she did, using up vacation and sick time in doing so.

205.   Regardless of which of the two reasons motivated Prudential's termination, Prudential never identified a single medical record that showed Plaintiff's fibromyalgia, CFS or any other medical condition had improved.

206.   Prudential found Plaintiff disabled from April 18, 2008 to May 1, 2015, but then decided she was no longer disabled after that date, in the complete absence of any medical records showing that her medical condition had changed, let alone improved.

207.    Even though the Court will review this action *de novo,* when an insurance company completely changes it decision and terminates benefits, based on the aberrant opinion of its salaried and non-examining doctor, and rejects the opinions of a half dozen treating specialists, two IMEs, the SSA, and a vocational expert, in the complete absence of any change, let alone improvement of the claimant's objective or subjective medical findings, it shows an arbitrary and capricious review at best.

**PLAINTIFF'S CAUSE OF ACTION**
**FOR LONG TERM DISABILITY BENEFITS**

208.    Plaintiff repeats each and every allegation contained in paragraphs 1 through 207 as if set forth fully herein.

209.    Fiduciaries are statutorily obligated to perform their duties prudently, solely in the interest of plan participants and beneficiaries, and strictly in conformance with the provisions of the plan.  Fiduciaries also have a statutory obligation to interpret and construe the terms of the plan fairly, and make decisions in accordance with plan language.

184.    The LTD Plan has not made any decisions concerning Plaintiff's claim for disability benefits.  Only Prudential, which has a conflicted pecuniary interest in denying claims, made the administrative claim decisions.

210.    Prudential failed to render its decisions in accordance with the relevant terms and definitions of the Policy.

211.    Prudential's termination was not supported by the evidence, did not comply with the Policy language, and was tainted by conflict of interest.

212. Plaintiff was and remains disabled within the terms and conditions of the Policy; therefore, Plaintiff is entitled receive monthly disability benefits from May 1, 2015 present.

213. As Plaintiff was and remains disabled within the terms and conditions of the Policy, Plaintiff is entitled to continued benefits on a monthly basis.

**PLAINTIFF'S CAUSE OF ACTION**
**FOR EQUITABLE RELIEF FOR BREACH OF FIDUCIARY DUTIES**

214. Plaintiff repeats each and every allegation contained in paragraphs 1 through 213 as if fully set forth herein.

215. ERISA § 1133 requires that in accordance with regulations of the Secretary of Labor, every employee benefit plan must (1) provide adequate notice in writing to any participant whose claim for benefits under the plan has been denied, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

216. ERISA § 1104(a)(1)(A) requires that a fiduciary of an employee benefit plan administer the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan.

217. ERISA § 1104(a)(1)(D), requires that a fiduciary of an employee benefit plan administer the plan in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA §§ 1001-1168.

218.    ERISA § 1132(a)(3) authorizes a plan participant to bring a civil action to enjoin any act or practice which violates any provision of ERISA Title I or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of this title or the terms of the plan.

219.    The LTD Plan breached its fiduciary duties in allowing Prudential to render all decisions on Plaintiff's claim for benefits, despite Prudential's conflict of interest and biased handling of this claim.

220.    The LTD Plan breached its fiduciary duties in failing to monitor the actions of Prudential properly and in failing to correct the biased, unfair and inequitable handling of Plaintiff's claim.

221.    Employers have a duty to select insurers for their employees with care, and to avoid hiring insurers with reputations for shoddy and hostile claim practices.  The Plan Administrator has breached this fiduciary duty.  Prudential breached its fiduciary duties in failing to render a fair and impartial decision on Plaintiff's claim for benefits under the LTD Plan; by rendering its adverse decisions in favor of its own financial self interest; in failing to consider properly the prior disability determinations and Plaintiff's SSD claim; and in failing to give proper weight to the opinions of Plaintiff's treating physicians.

222.    Prudential's termination decision is further evidence of its breach of its fiduciary duties because all of the reliable medical evidence submitted on this claim mandates finding Plaintiff disabled from any gainful occupation.

223.    By making a decision on Plaintiff's claim for benefits by failing to use a neutral review process, Prudential failed to provide a reasonable claim procedure and breached its fiduciary duties to Plaintiff.

224.   As a result of Prudential's violations of ERISA and of the terms of the LTD Plan, Plaintiff has been harmed and is entitled to the injunctive and other appropriate equitable relief.

225.   Plaintiff is entitled to equitable relief against Prudential and the LTD Plan as a consequence of their knowing and intentional breach of their respective fiduciary duties, in the form of (a) a permanent injunction prohibiting them from repeating the bad faith conduct, which led to the wrongful termination of Plaintiff's claim, in the handling of future claims of other claimants, and (b) an Order requiring the LTD Plan to replace Prudential as the LTD Plan's claims administrator, and precluding the substituted claims administrator from requiring standards of proof in excess of that called for in the LTD Plan.

**WHEREFORE,** Plaintiff respectfully requests this Court to:

A.    Declare and determine that Plaintiff's disability commenced April 18, 2008, and that she continues to be disabled under the LTD Plan and entitled to monthly disability benefits since May 1, 2015, and continued coverage for any other group benefits that were terminated as a result of LTD benefits being terminated;

B.    Order Defendant to compensate Plaintiff for her disability in accordance with the terms of the LTD Plan;

C.    Order Defendant to reimburse Plaintiff for the costs that she incurred when coverage under other group benefit plans were terminated as a result of LTD benefits being terminated;

D.    Award Plaintiff attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g);

E.    Award Plaintiff penalties pursuant to 29 U.S.C. § 1132(c)(1);

F.    Remove Prudential as Plan Fiduciary of the LTD Plan for a period of five

years;

G.    Appoint an Independent Fiduciary as Plan Fiduciary of the LTD Plan to

replace Prudential for a period of five years; and

H.    Grant Plaintiff such other necessary and proper relief, including

prejudgment interest, costs and disbursements, as to which she may be

entitled.

Dated:  Jericho, NY
        February 10, 2016

LAW OFFICES OF JEFFREY DELOTT

By:    _____
       Jeffrey Delott, Esq. (JD8688)

       Attorneys for Plaintiff
       366 North Broadway
       Suite 410
       Jericho, NY  11753
       (888) 572-0861